Good morning, Your Honors. Gretchen Fusingay, appearing on behalf of the defendant appellant Philip Gene Gilles, if it please the Court. This appeal originates out of what began as an investigatory stop at LAX on June 5, 2002 by several DEA agents of Mr. Gilles and Mr. Brittingham, who was the co-defendant and is now an appellant in a related case up on this appeal. The investigatory detention originated because of information that was obtained from a tip by a DEA agent or special agent, Fulmer, on the East Coast, and he relayed that information to DEA agent King on the West Coast here.  MR. BRITTINGHAM Counsel, help me with something. I'm remembering the general structure from when I learned criminal law in 1966, so my understanding may be stale or I may have forgotten something. The way I remember it, probable cause just matters for the arrest. You need reasonable suspicion for the stop, you need probable cause for the arrest, has nothing to do with the search. For the search, it can be pursuant to a warrant or pursuant to consent or pursuant to a special exigency or incident to an arrest. Probable cause to think that there's contraband is not a justification for a warrantless search. Do I have that right? MS. GILLESPIE Yes, Your Honor, I would agree with that. MR. BRITTINGHAM Now here, it looked like there was reasonable suspicion for a stop, and once they had the lie at the stop, there was probable cause for an arrest. Is your focus on whether there really was probable cause for an arrest? MS. GILLESPIE Your Honor, that is my focus. MR. BRITTINGHAM Or on the nature of the consent? MS. GILLESPIE My focus basically is both. I believe that there was no free and voluntary consent because it was not supported by probable cause for the arrest. And the critical part of the sequence of events which occurred is that the agent essentially approached Mr. Gillespie and Mr. Brittingham, supporting the authority of their positions. But counsel, doesn't the tip which was corroborated establish probable cause in this situation? And can't we cut right to the chase on that? MS. GILLESPIE No, we don't believe it did because the tip provided only information that related to non-criminal conduct. There, with the exception that, well, let me rephrase that. Most of the tip related to non-criminal conduct. The element of the tip indicating that PCP may be transported by Mr. Gillespie and Mr. Brittingham from either the California area, which is a large area, or Las Vegas, Nevada, was supposition. It was not a definitive piece of information. MR. BRITTINGHAM I thought there was some corroboration. Am I wrong? MR. GILLESPIE I believe there is. As a matter of fact, I'm a little surprised, frankly, to hear you focus on the probable cause aspect. Because you have a reliable tipster. They've used before, always turned out to be right, apparently. They have the information about the false identification, where they were going to go, the airline they were going to use, their descriptions. Then the fact that they were they lied about them, they originally said they had checked luggage. As a matter of fact, I would encourage you to go on to the second point, the consent, because the probable cause issue is pretty clear, isn't it? MS. GOTTLIEB Your Honor, I will go on to consent, but I would like to correct some of the statements that were just made. The corroboration, the initial tip did not include description, did not include the airline, did not include false identity that would be carried by Mr. Gillespie. MR. GILLESPIE Did not indicate the names they would be using? MS. GOTTLIEB No. Only indicated the name that Mr. Brittingham would be using. MR. GILLESPIE Wasn't that enough? MS. GOTTLIEB Mr. Gillespie. MR. GILLESPIE Isn't that enough? I mean, we just, all three of us, well, maybe two of us, had to travel by airplane to come here. It's really annoying, and among the reasons it's annoying is you have to keep showing identification. Everybody knows your name matters to fly, and you had a tip, false ID will be used, and sure enough it was. And as I recall, it was used in the false name that the tipster said. False ID would be used by Mr. Brittingham was what the tip indicated, not by Mr. Gillespie. And when Mr. Gillespie was asked by Agent King at LAX, are you, did you check any luggage, he answered, yes, I did. It was Mr. Brittingham who indicated, no, I did not. So there is some respectfully correction of those particular facts. But moving on to the consent, assuming that there, this Court finds that there was probable cause or probable suspension. Kennedy, I understand you're on it, and I would like to more beneficially use the time before this Court. At the time the consent was made, it was after Agent King and Agent Vaux and Agent Morrison had stopped the investigatory investigation and interrogation and had begun leading Mr. Gillespie and Mr. Brittingham down elevators into a private room of the airport. He certainly was under arrest at that point in time. Because he was Did they not tell him that they could leave any time? No. At that point in time, the information that was conveyed from Agent King to Mr. Gillespie was that you are not getting on the airplane. It's going to take us at least two hours to obtain a search warrant, and we are going to obtain a search warrant. This raises two problems for me that may just be underbrush because I don't understand something. It seems to me that you're probably right. They were under arrest. If they were under arrest, then why isn't it a search incident to an arrest to go through their things, number one? And number two, all of us, we check our baggage and then, gee, until they got the fancy new x-ray machines, I was always getting those TSA cards in my baggage saying that they pawed through all my things. I thought everybody, once you checked your baggage, gave up their privacy and their baggage. Your Honor, before answering that question, I intended to advise the Court that Mr. Andre and myself have divided the 20-minute period for argument into increments of 10 minutes each, and I would respectfully request two minutes to respond in rebuttal. Well, you've used 12-and-a-half minutes. Excuse me. Your side has 12-and-a-half minutes left, so you use them anyway you wish. All right. May I just quickly respond to the question? I don't believe that everybody understands that, Your Honor. And certainly when Mr. Gillis was approached by Agent King, he indicated you've done nothing wrong, nothing is the problem, and proceeded asking questions. So certainly Mr. Gillis did not understand, and when they started leading Mr. Gillis in Brittingham down the elevator, that certainly, as Your Honor indicated, was an arrest. There isn't some general consent to search of your baggage when you check baggage on an airplane? Your Honor, yes, there is, but I'm saying that I don't believe that Mr. Gillis was aware of that, and under the case of the United States v. Welsh, which we indicated in our brief, we believe that the authority to infringe on the luggage, although there may be an implied consent on checking it, should have been conveyed to Mr. Gillis. Well, as a matter of fact, didn't he initially, and you'll correct me whether it's both or one of these gentlemen, initially declined to allow the baggage to be searched? Isn't that correct? Was that your client or was the other gentleman's client? Mr. Gillis did decline twice, Your Honor. Okay. So he knew perfectly well that he was able to decline to have his baggage searched, right? Well, he knew it until he asked Agent King to stop harassing me, and Agent King insisted on questioning him and insisted on getting a consent. And when he said no the second time, he obviously knew he wasn't able to deny consent because he was apprehended and arrested. Then it gets down to the probable cause question you're talking about. If there was probable cause, then the consent's not coerced in the sense of the law. That's correct, and we submit that there was no probable cause even at that point. Okay. And I would defer to co-counsel for his 10 minutes. Thank you, counsel. Good morning. Jean-Claude André on behalf of Defendant Appellant Brittingham. We, of course, agree with everything that Ms. Fusilier just said, but we would like to focus on a couple issues that are unique to Mr. Brittingham. First and foremost, we don't believe that Mr. Brittingham ever consented. Whenever there's an issue with respect to whether a defendant consented to a search, the government bears, and this Court has repeatedly used these two buzzwords, government bears a heavy burden of establishing that consent. What's interesting about what happened in this case is that the government first put on Agent Morrison. Agent Morrison was the officer who was talking with Defendant Brittingham. Agent King was the agent who was talking with Defendant Jilts. Agent Morrison initially testified that she asked Brittingham if he consented to a search of his luggage and that he said yes. Subsequently, she changed her testimony. She said that she didn't ask him, it was King who had asked him. The problem then becomes that when King was put on the stand, this is all contained roughly in pages 226 to 240 of our excerpts of record, King then said that he never said anything to Brittingham, he never heard Brittingham say anything, and he never, he does not recall any conversation between Morrison and Brittingham. Well, whoever did it, whichever agent did it, do you agree with what I think your co-counsel said, that at some point your client consented and that the real issue is whether there was probable cause at the time he gave the consent? Because if there wasn't, then it was pressure to the point that it was an involuntary consent. Is that the issue? Respectfully, I disagree, Judge Smith. First, I think there's an issue with respect to Brittingham alone as to whether he consented at all. Okay. So you're claiming that notwithstanding what the record suggests, he did not consent. Right. That he never consented. That there's this one statement by Agent Morrison that he did, and then she subsequently in her testimony backed away from it and said, oh, well, but Agent King took care of securing his consent. But then Agent King said, no, I didn't. So you have these conflicting, contradictory statements that cannot, in our view, preponderate over Brittingham's declaration, which is at excerpt of record page 156, that he never consented. But where in the record do you have this colloquy you're talking about where the one agent originally said that he or she asked and there was consent, then backed away, and the other one said that King, I guess, didn't do it? Where is that in the record? This would be in Brittingham's excerpts on page, I believe, 226, 227, 228, and I think it jumps to 238, 239, 240. But in that 14-page span, it's all in there. That's where both Morrison and King are testifying. I think it came out pretty clear in the suppression hearing, and then it got muddied up a little at the trial, and there was no motion to renew the motion to suppress. It just got muddied up a little. Am I remembering right? Respectfully, I don't think you are, Judge Kleinfeld. Those pages are all from the suppression hearing. I just happen to know that the 200s are from the suppression hearing, whereas our trial excerpts are in the 400s or 500s. So to get back to your question earlier, Judge Smith, we contend that Brittingham never consented. But then, if he did, that consent was not voluntary. And this Court has repeatedly applied the five factors laid out in Chan-Gimenez. This Court has said that they're the customary factors. The Court applied them as recently as 2004 in the case of U.S. v. Soriano. And contrary to the- This is in terms of consent, the Schneckloth versus Bustamante, as far as the U.S. Supreme Court is concerned, is that what you're talking about? Chan-Gimenez is Schneckloth's progeny, Ninth Circuit progeny. Right. And Chan-Gimenez says that in order for a defendant to prevail on a suppression motion claiming that his consent was involuntary, he need not satisfy all five factors. And we can see that, obviously, in this case, the agency's done that. Is the totality of the circumstances in effect? In effect. So Chan-Gimenez, I guess, provides factors that this Court can look at to determine whether the totality of the circumstances requires suppression or denial of suppression motion. In this case, there are five Chan-Gimenez factors, and certainly the officers didn't have their weapons drawn, so that one factor is a loser for Mr. Brinningham. But the other four factors weigh in his favor. In particular, although he did initially, like Mr. Gillis, refuse consent, by the time that the officers asked him again, as they're leading him down this escalator out of Terminal 1 to the DEA office, it doesn't matter that he knew that he could refuse to consent. They already told him, we're taking you to our office. You're going to be detained for two hours. You're going to miss your flight. So at that point, he certainly didn't matter that he knew, in theory, he had a legal right to refuse consent. Additionally, he was clearly in custody, because, again, he was being detained. He was being taken away from his flight. There was no way that he could go away. Do we need the consent at that point, or is it a search incident and maybe also just a search consented to when anyone checks baggage? Well, I actually believe that when you hand over your luggage to – and maybe this is a little bit different in 2002, and now that we have TSA, it's different now. But I believe that when you hand over your luggage to an airline, you're actually entrusting them with your luggage as a – I guess as a bailment. And so you're not necessarily just blanketly giving up all rights to have your When I get my luggage to the storage facility at the Seattle airport when I overnight there, that's a bailment, and I do not consent to their going through my stuff. But when I check it at the airline, they do go through my stuff. All right. I'm blanking on the name of the case, but I recall reading a case where – and I believe it was a Supreme Court case where they talked about whether law enforcement can detain luggage based on reasonable suspicion or whether they need probable  And I think the logic of that case – the logic of the flow from that case is that you cannot just open up luggage for law enforcement purposes, maybe for safety purposes, but not for law enforcement purposes without some – without some quantum of suspicion. In this case, it would be probable cause for actually opening it up and looking for contraband that you specifically believe to be inside of that luggage. But as I said, I apologize, I don't have that case. What about the search incident to an arrest? Well, if it's not on their person, then I don't see how it would be a search incident to arrest. In this case, the luggage was down – I don't know if it was curbside or if it was behind the counter, but there was an LAPD officer named Lopez who was watching the baggage, making sure they didn't go on the conveyor belt. So the government really does need consent to search the luggage. I – I – You really need to overcome – you have to show that the district court's finding of consent is clearly erroneous. It's actually clearly erroneous, right, or I guess that the consent was not voluntary, which this Court would then review, I believe, de novo, because of the legal issues intertwined there. In the last minute and a half that I have before I sit down, I would like to address the minor role adjustment that Mr. Brittingham requested the district court. All of the individuals who spoke about Gillis's and Brittingham's respective roles in this alleged conspiracy to transport the PCP, all of them admitted that Brittingham was the junior conspirator, played the lesser role between the two of them and also the lesser role vis-a-vis the two suppliers, Budd and Robb. And King stated that in his investigatory report, that basically Gillis was the one who set up the encounter with Budd and Robb. He was the one who handled the money. He was the one who actually took the drugs, and that then when they went to the airport, Brittingham was essentially the bailee, to use that word again. Gillis's own admission in his motion to suppress is consistent with that as well. He actually used the term junior conspirator and said that Brittingham was in charge of carrying the bags because usually the senior guy doesn't want to be handling the drugs. And, of course, Brittingham also made some statements, whether they're self-serving or not. He said, I've only done this once before. I was just paid to go along with Gillis and get the drugs. So the standard that this Court has to apply in determining whether someone's entitled to a minor role adjustment is what their role is vis-a-vis their co-conspirators, indicted or unindicted. Kennedy, this is our standard a little different. I mean, I'm sympathetic to your argument, but I'm not the sentencing judge. I haven't been a district judge for a long time now. Don't we have to just declare the district judge unless he was out of bounds to the point of abusing his discretion? I believe on this the – I believe on this issue the standard of review, again, is clear error. But we believe that the district court clearly erred. And I don't want to take up any more time, so I'm going to leave Mr. Spitzley a little bit of time. But the district court relied on two factors in denying the minor role adjustment. It said, one, there are a lot of drugs, and, two, Mr. Brittingham has a significant criminal history. Quantity of drugs is one of the factors that this Court has allowed a district court to take into account, but it cannot be the only factor. Criminal history is a factor that this Court has never recognized as permissible. So when you take that impermissible factor out of the equation, what you have here is a district court relying solely on drug quantity to find no minor role adjustment. And it's our position that because the Court has to do more than just look at drug quantity, that would be improper. Roberts. Thank you, counsel. You're going to reserve your minute and ten seconds for rebuttal after we hear from the government. Okay. Go ahead. Good morning, Your Honors, and may it please the Court. Beyonce Kim for the United States. Before going to the consent issue, which I think is the principal issue that's raised in appeal, I did want to direct the Court to a couple pages of the government's Gillis appeal, in particular, page 48. That's the declaration submitted by Special Agent Fulmer, and it's in that declaration in paragraph 2, in particular, that he describes the information that he received from the reliable informant, namely that the reliable informant said that these two individuals were going to be traveling to purchase PCP. He also says, Agent Fulmer, in paragraph 2 of his declaration, that Brittingham was using the alias Paul Rogers, and that Gillis was also going to be traveling using an alias, but he didn't know what the alias was. Special Agent Fulmer then did a little bit of investigation and determined that this individual, Paul Rogers, defendant Brittingham's alias, was on the same itinerary as an individual named Albert Taylor. And it was through that investigative work that he was able to determine, based on what the reliable informant had told him, that both of the individuals were traveling under a pseudonym. So I do agree that there's no real issue here with respect to the reliability of the informant. That, of course, relates to the probable cause issue. And let me address that, though, within the context of the consent. And maybe what I should start by doing is addressing, Judge Kleinfeld, your two questions about whether this could be upheld as a search instinct to arrest, or perhaps whether there's some analog to the border search doctrine pursuant to which the agents would have been allowed to search the bags. I guess those aren't bases that the government is relying on on this appeal. They're not bases. I know you didn't argue them, but I worry a little that sometimes the government doesn't want to win the easy way. It wants to win the hard way so that it can get some law that's even more expansive. I do appreciate that, Your Honor. I don't want to give the government that on airline search. Well, I do think that in this case, with respect to the consent, that Judge Pragerson made extensive factual findings after hearing all of the evidence, the testimony of witnesses. So I do think that there's a very easy basis for affirming simply based on his factual findings, which the appellants in this case have not even come close to showing were clearly erroneous. But I did want to just address the questions you had reasonably. With respect to the search incident to arrest. Could we go that way if we wanted to? I'm not sure that, Your Honor, the Court could in all candor, Your Honor. With respect to the search incident to arrest. That's because the bags weren't in his possession or within reach? That's right, Your Honor. That's with respect to the search incident to arrest. There's also the somewhat unusual factual situation in this case where the defendants were taken to the elevator, told that they were going to be detained while the search warrant was obtained, and then subsequently the defendant, Gillis, basically tried to negotiate something more that he could get for his consent. What is the current state of the law on what general consent every passenger gives when he checks his bags? Your Honor, I'm not aware of a case holding that simply by checking a piece of luggage. And as long as it's. We're not allowed to lock them anymore, except with locks that TSA can open. Yes, that's right, Your Honor. And this case is somewhat ironic in that it involves the transportation of five bottles of liquid. That's something that I understand is not really permitted. People can have all kinds of private or dangerous things in their luggage. If you toss your Bic lighter in your luggage or your matches for your pipe, they'll also pull them out. I think that's right, Your Honor. And there's no question that I think any person who travels nowadays has to be aware, and even if he's not aware, it would be reasonable to assume that the government hasn't taken the position in this case. And I'm unaware of any cases standing here today. Is it significant that the scanning is for safety of airline travel as opposed to potentially uncovering contraband? Well, it might be significant, Your Honor, although in this case there was ample evidence, and this goes to the destruction of evidence issue that was raised, that the transportation of PCP was extremely dangerous, not simply a criminal act, but also because the PCP is dissolved in ether, which is highly flammable, because these bottles that they're being transported in weren't safe to be transporting this kind of material, and that there was a serious safety concern in transporting these. So here, with the safety search, you've got it straight down the middle. The ether might blow up the plane, and if somebody touched the bottles, they might get high or whatever you get from PCP. I think that's right, Your Honor. But, you know, one other factor that perhaps courts might look at is whether this was a flight that was simply domestic or whether it was a flight leaving the country. As Your Honors are aware, under the border search doctrine, the Fourth Amendment is more lax in situations like that, given the government's compelling interest in protecting our borders. This was a domestic flight, however. But, counsel, in this particular case, following up on what Judge Kleinfeld said, does the government concede that if there was no consent given here, putting the issue aside, if there's no consent, there is no other lawful basis for searching the luggage in this case? Your Honor, that's the position we are taking on this appeal. And we take that position based on the factual findings that District Judge Pragerson made, Your Honors, at the evidentiary hearing, after hearing the testimony. A defendant, Briningham's counsel ---- Wait a minute. Are you saying that if there was no consent, then the ---- we have to reverse? Your Honor, there was no other basis that the government has argued on this appeal for searching the luggage. Why didn't the government get a search warrant before it went to meet these people at the airport? It had a tip. It would have been relatively simple to do. What happened? Well, I don't know if there's anything in the record that explains that. I don't think that question was ever asked. You agree it could have been obtained? I do believe that it could have been obtained based on the reliability of this informant, the detailed information that he provided that was corroborated. But, Your Honor, I do think the record suggests some reasons why that may not have been done in this case. Namely, I don't think that the agents with the DEA knew until relatively late in the game exactly what flight the two defendants were going to be taking out of LAX. Let me tell you why I'm ---- I thought this was pretty clear about what they were going to do. Either there's probable cause because this was a really reliable informant or it's not reliable. So either you knew and you had enough information to get a search warrant or you didn't. Enough information, Your Honor, but perhaps not enough time on this record, I think, is the fair implication. But in any of ---- When did the tipsters give his tip to the DEA? Your Honor, there appeared to have been several conversations that the tipster had with Special Agent Foreman. Was it more than two hours before they went to the airport? I know that there was a conversation that took place on, I believe, June 2nd. I think that's the date. Well more than two hours. Well, but that was ---- that information was simply that they were going to be ---- there were going to be these two people going to either Las Vegas or California. Subsequently, there was a further conversation between the reliable informant and the Special Agent Foreman. I believe the day before the tipster, excuse me, the LAX. Agents made it clear they were going to go get a search warrant. It would take about two hours. My point is that they could have done that during that time and had information previously from the tipster a day before, whatever. They certainly had plenty of time to get a search warrant. Your Honor, if they did have that second subsequent conversation the day before, I agree with Your Honor, that was not done in this case. But what happened is that both defendants consented. Defendant Gillis doesn't contest that he consented because he was the one who proposed that he get searches warrant. Let's go to that. The counsel has indicated that I believe it was Mr. Brittingham who he says did not consent. Where in the record do you find his consent? Your Honor, in two places. First of all, there's Special Agent Morrison's declaration. And second of all Where in that? Your Honor, that would be at I have the reference to the defendant Gillis's government's excerpts of record. So the excerpts of record filed by the government in that appeal. And that, Your Honor, is GGR 62 through 64. And in particular on GER 65, Special Agent Morrison says a defendant, referring to defendant Brittingham, also stated that he was consenting to the search. Now, then there was an evidentiary hearing where she was subject to cross-examination. And she waffled a little bit at the evidentiary hearing. First, she said that defendant that she had actually procured the consent by defendant Brittingham. And then in the next page, and I'm referring again to the GER submitted in the Gillis appeal, to 227 through 28. I believe those are the same pages that defendant Brittingham's counsel referred the court to. Then she waffles a little bit and says, well, I didn't ask him directly. Instead, Special Agent King, who is standing next to me, asked defendant Brittingham if he consented, and I heard him consent. There was no other evidence, Your Honor, contradicting that. And so Did King corroborate that when he testified? No, Your Honor. Special Agent King did not recall having that conversation with defendant Brittingham. But regardless, Your Honors, of how the consent was procured and the circumstances and events leading up to it, Special Agent Morrison undisputedly heard that he did, whether in response to a question by her or Special Agent King, give his consent. That was unrefuted. Counsel, let me tell you my problem, and you tell me the solution. My problem is I'm worried about expanding the notion of consent unnecessarily. When a person gets taken down to a special investigation room at an airport and told you can't go on until and unless you consent to a search of your baggage, that's a lot of coercion. Yes, Your Honor. Now, maybe that's okay. Maybe it's not. I'd rather not say if I don't have to. Your Honor. But it strikes me that when you have plenty of evidence that somebody has not only contraband that could land them in jail in his luggage, but contraband that could endanger the flight in his luggage, the general consent of all airline passengers to have their bags checked for things that may interfere with flight safety would apply, and we never have to even reach consent in the special investigation room at the airport. Yes. And looking at the bag to take out bottles of PCP, which they already had a corroborated tip on, is good enough reason to look in the bags for bottles of PCP to prevent the ether and the drug that can be absorbed through the skin from getting on the plane. I know you didn't raise it, but we're allowed to affirm for anything that is shown by the record, and I'm wondering why we can't do it that way. Well, let me address your concerns, Judge Kleinfeld, in two ways. First of all, although it hasn't been the government's position in the district court or on this appeal that there are these alternative bases for affirmance, for certain, this Court can affirm on that, on alternative bases, and what I would ask is for permission, if the Court would allow it, for me to research these issues, because this is the first time in all candor that the issue has been raised with respect to this particular appeal, and if I find... I guess you must have always checked your bags at airplanes with the fancy X-ray. At the more rural airports where they don't have the fancy X-ray, they paw through your stuff. I did grow up in Los Angeles, Your Honor, and that's where the airport was in this case, and not exactly a rural town, so I do confess to that charge, Your Honor, but let me, if the Court is willing to indulge that, let me research those issues and give a more informed response. The second response... I don't know if we will or not, but do you know offhand of any problem with that? Yes, Your Honor, with respect to the search incident, the rest basis... No, no, I wasn't asking about that. I was talking about, do you know of any problem with the theory that submitting the luggage to be checked at the airline authorizes a search for things that may endanger the flight, such as matches, spray cans... For a domestic flight, Your Honor. Lighter fluid, you can't bring home a can of Zippo lighter fluid. Right, and these are all what you're referring to, Your Honor, I think are recent regulations that have been promulgated, and I'm not aware, standing here today, of any cases addressing whether that essentially gives the government the right to search the bags, and you have to, of course, look at this historically, when there wasn't the regulation that there is today about transporting... How historic do we have to be? When was this search? This search was on June of 2002, Your Honor. But the reality, counsel, is, with all due respect to Judge Kleinfeld, there's no authority anywhere, is there, that would allow... We're talking about one case, the TSA. That's one branch of the government. This is the Drug Enforcement Agency. There's no authority anywhere that I'm aware of that would allow the Drug Enforcement Agency to search bags based upon what the TSA normally does, is there? Well, that's an interesting question, whether an agent of one agency can, pursuant to regulations of another agency, conduct searches. In the border search context, for example, customs agents have to be the ones who conduct the customs border search. And I, again, because I'm unaware of... They're performing a different function. They're trying to protect the security of the flight, a very important function, whereas in this case, the Drug Enforcement Agents are trying to interdict the transportation and use of illegal narcotics. Yes, Your Honor. That's a different function. Yes. And just to add one twist, I don't think that it's the special agents of the Drug Enforcement Administration who actually opened up the bag. Who did? There was a detective, Detective Lopez, I believe, who was attached to, assigned to airport security, essentially. LA airport police person? I think maybe a county sheriff, Your Honor. I'm not absolutely positive. But it wasn't a DEA agent. That's all to say, Your Honor, that the DEA was working with other law enforcement officers. Did they direct him to do that? They did direct him to do that, Your Honor. That's in the record. That's in the record. But that might make a difference if there were some TSA regulation allowing someone affiliated with the airport to conduct the search. I just wanted to point that out. Was the TSA involved in any way? Not that I know of, Your Honor, except in the respect that I just mentioned. I thought the Fourth Amendment just went to what the government could do, and these things of this agency or that, or no matter whether they follow their own regulations or whether they can have a big interagency spat. But as far as the Constitution goes, I wasn't aware that it mattered. I'm sorry, Your Honor. I didn't hear the last part of your question. As far as the Constitution goes, I wasn't aware that it mattered what agency did what with the baggage. I thought that was just regulations between agencies. I think that's a good point, Your Honor. And again, because I'm not aware of any specific TSA regulations in 2002, it's hard for me to fully address this question. But I did want to return to your concern, Judge Kleinfeld. This was a very unusual case, and it's a case that would not in any way, I don't think, expand this Court's jurisprudence with respect to consent, and this is why. This is not a case where the police or law enforcement went to a defendant and said, if you do not consent, we will detain you. What happened is we will detain you. That is the painting of a search warrant. What happened, rather, is that law enforcement went to the defendants and asked them, separately, will you let us search your bags? Both defendants said no. And that's an important fact right there. Under the Meza-Corrales case, they clearly understood their right not to consent. Now, at that point, law enforcement agents did not try to link the consent issue with the detention. They simply said, well, this is what's going to happen. We are going to detain you temporarily while we obtain a search warrant. There wasn't any attempt to, in other words, revisit the consent issue. That's kind of a stretch, don't you think, counsel, to suggest that they didn't get the connection? I mean, that was a lot of coercion there. Well, it's – I think that this case is different from other cases, Your Honor. For example, the Oceltree case where there is a much more explicit linkage made by the agents. And here you've got Frittingham, by your own admission, who his counsel says he never consented. You told us in the record there's a declaration that Morrison said that happened. And then when she was cross-examined, she wasn't sure. She said the king said a king wasn't certain. The government bears the burden here, doesn't it? It does, Your Honor, but we satisfied that burden because there wasn't any other evidence directly refuting Agent Morrison's testimony with respect to the consent answer. And that's what we're going to do. Did Frittingham dispute that he was – that he gave a consent? Yes, he did in the district court, Your Honor. So there's a conflict. Well, this was litigated, and the district court made his finding. But what's the standard here for us to determine whether the district court correctly made a determination on the issue of Frittingham's consent? Clear error, Your Honor, clear error. Okay. Now, I want to again return to Judge Kleinfeld's concerns because – because I'm going to try to do it quickly, counsel. Your time has expired. Yes, Your Honor. Thank you. All I want to say, Your Honor, is after the agents said we're going to detain you, then the defendants – defending Gillis is the one who proposed, well, if I consent, then will you let me be released? That's completely different from all of the other cases. The defendants were essentially trying to bargain and negotiate with the agents. This, again, evinces that their consent was rational, the product of willful and willing action. And again, it's just completely at odds with the notion that they were coerced. They were getting a substantial benefit. Thank you, Your Honor. Thank you, counsel. Ms. Fusilier, I think you have the rebuttal time. Yes. Thank you, Your Honors. Just briefly, I'd like to go back to the consent of the luggage. And although the government's position is that he was negotiating, what the record indicates clearly is that there was a show of force to which he submitted. The show of force was that he was surrounded by DEAs. Officer Lopez, who was with the LAPD, although he was working in conjunction with the DEA on June the 5th, he had been assigned by King to stay with the luggage for the entirety of the time that King and the other officers were interrogating Gillis. Gillis, I think it's important, as this Court has indicated, there is an insurmountable amount of coercion that is attendant to one who is being led down to a private anteroom because he has failed to give consent. Counsel, if we reach the conclusion that there was probable cause to arrest, does that affect the consent analysis? Your Honor, I believe it does. We would rely on the case of U.S. v. Place, which is cited in our brief on page 25. And it does indicate that to search luggage, articulable facts need to be specifically testified to. And in this particular case, there might have been probable cause to arrest Gillis, the person, but certainly that does not extend over to the probable cause to search luggage that has been out of his possession, been monitored by Officer Lopez, without going through the perfunctory procedures of getting a search warrant, especially when King testified during the suppression hearing, when Gillis told you that he was not transporting drugs or guns, did you have any reason to disbelieve him? And he said categorically, no, I had no reason to disbelieve him. So we do draw a complete distinction between the circumstances of seizing someone's body, his person, and that extension over to the seizure and search of luggage. The government has not cited a case which authorizes such an intrusion without the search warrant, and as this Court has indicated, Officer Fulner, or DA Agent Fulner, obtained his tip on June the 3rd, and he, on the same day from his declaration and from the motion to suppress hearing, he contacted BWI, he determined the flight from Baltimore to LAX, he determined the flight from LAX back to Baltimore, the dates that the return flight would be on, the time of the return flight. They were equipped with more than sufficient evidence, if they really had a reliable, credible informant, to have obtained a search warrant before the detention. And on that we would submit. Your time has expired. Thank you. The case just argued will be submitted for decision, and the Court will adjourn. All rise. Here to serve me, all those having had business before this line of report, the United States Court of Appeals to the U.S. Circuit.  Thank you.
judges: O'scannlain, Kleinfeld, Smtih.